MEMORANDUM OF DECISION RE: TERMINATION OF PARENTAL RIGHTS PETITION
I. INTRODUCTION
This case arises out of a petition filed with the Superior Court for Juvenile Matters in Willimantic on November 16, 2001, by the Department of Children and Families (hereinafter referred to as the "petitioner" or "department") whereby the department seeks the termination of the parental rights of Dawn A. and Thomas A. to their two children, to wit: Kristy Lee, who was born on April 1996, and who is currently six years of age and Kyle, who was born on April 1999, and is currently three years of age. The childrens' parents will be referred to herein as mother or father and collectively as the "respondents."
On March 5, 2002, prior to the case being transferred for trial to the Child Protection Session, father executed an affidavit consenting to the termination of his parental rights which, after a full canvass in the presence of his attorney, resulted in a finding by the court (Mack J) that said consent was knowingly and voluntarily made and was a valid ground for the termination of his parental rights. A finding that termination of his parental rights is in the best interest of his children was deferred pending the decision as to mother. Neither father nor his attorney desired to further
participate in the trial and were therefore excused by the court.
II. HISTORY OF THE PROCEEDINGS
Court proceedings originated in Willimantic on September 12, 2000, when the department filed a petition against the respondents alleging that said children were neglected in that they were being denied the proper care and attention physically, emotionally or morally and were being CT Page 668 permitted to live under conditions, circumstances or associations injurious to their well-being. General Statutes § 46b-120 (8) (B) (C). On the day the neglect petition was filed, an order of temporary custody was issued by the court (Mack J.) which was continued on September 18, 2000. On April 4, 2001, the children were adjudicated by the court (Mack, J.) as neglected under (8) (C) of said statute after respondents pled nolo contendere. On March 5, 2002, said commitment, which was initially for a period of one year, was ordered by the court (Mack J.) to be maintained until further order of the court and it remains in effect.
On September 12, 2001, the court (Mack J.), pursuant to a request by the petitioner, approved the department's permanency plan of termination of parental rights and adoption and found that further efforts by the department to reunify the children with their mother and father were no longer appropriate. On March 5, 2002, the court (Mack J.), again, approved termination of parental rights and adoption as the permanency plan for both children, said approval was over mother's objection. The court also found that the department had made reasonable efforts in order to prevent the removal of said children from their parents' care and that the department made reasonable efforts in order to achieve the previously approved permanency plan.
Trial of the termination petition was held on six days. to wit. September 17, 19, 20, 26, 27, and October 3, 2002. The court finds that mother and father have appeared and that each of the respondents and the children were represented by counsel. The court has jurisdiction in the matter. There is no proceeding pending elsewhere affecting the custody of these two children. Although Thomas A. has consented to the termination of his parental rights, Dawn A. remains steadfastly opposed to the termination of her parental rights. Pursuant to General Statutes §17a-112 (j) (3) (B) (i) the petitioner alleges as a ground for termination that both children have been found in a prior proceeding to have been neglected and that the respondent mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, mother could assume a responsible position in the lives of said children. Petitioner also alleges, pursuant to subparagraph (D) of the cited statute that there is no ongoing parent and child relationship, as the same is defined therein, between said children and mother.
During the trial, the court heard from fifteen witnesses. The seven witnesses called by the petitioner included an evaluating psychologist, two therapists who treated Kristy, the original foster mother, the current foster mother, a department case aide, and the current department case worker. Called by mother were a probation officer, a substance abuse CT Page 669 counselor, the program director at New Perceptions, an AIC case manager, two corrections officials, and a friend of mother.[2] Mother also testified. The child's attorney called no witnesses. Forty-six exhibits were received in evidence from the parties including thirty-five from the petitioner. ten from mother and one from the child. On September 17. 2002, the court, at the petitioner's request. took judicial notice of all of the items referred to in petitioner's motion of said date, with the exception of those facts alleged in paragraphs thirty and thirty-one of said motion. The events covered by the court's taking of judicial notice were court proceedings prior to the proceedings referred to in the current court file, all of which involved the respondents and the department with the two children who are the subject of the current petition. The court, after reading the termination petition and the summary of adjudicatory facts filed herewith, reviewing each of the exhibits, considering the testimony of each of the witnesses, assessing the credibility of all witnesses and considering the arguments of counsel, does make the following findings.
III. FACTS
 A. Events Prior to the Termination Petition
In August, 1998, the respondents were residing in the Danielson, Connecticut area with
Kristy. Kyle had not yet been born. Both respondents are natives of Massachusetts and have ties to the Boston and Worcester areas. On August 3, 1998, mother was arrested for Disorderly Conduct and Assault in the Third Degree. The charges arose out of an incident in which father allegedly found mother asleep and intoxicated on the sofa while their daughter was sleeping. When father attempted to wake mother, she allegedly struck him with a chair and when father attempted to restrain mother, she sustained a split lip. The arrest resulted in a full protective order being issued against mother. As a result of said arrest mother was ordered to undergo an evaluation at the Community Prevention and Addiction Services Facility in Willimantic. During said evaluation mother reported that she had been abusing alcohol since she was seventeen; mother's age at the time of the evaluation was thirty-seven. She also reported participating in alcohol abuse programs in 1983 and in 1986. Mother claimed that she had been sober from May of 1992 through January of 1998. As a result of a referral from the department. mother underwent an additional evaluation at United Services on September 23, 1998. The evaluation resulted from allegations that mother was abusing both marijuana and cocaine. Mother admitted that she had a problem with alcohol and indicated that she needed help with said problem. Mother also CT Page 670 reported that she had been using cocaine since she was age twenty. Mother further reported that she received inpatient treatment for a period of twenty-one days toward the end of 1989 at Adcare and received similar inpatient treatment in 1985 through Doctor's Hospital. Mother also reported that she had been convicted on four occasions in the state of Massachusetts for operating a motor vehicle while under the influence of liquor. The evaluator recommended a twelve week physcho-educational group to address mother's substance abuse. The programmer indicated that mother lacked motivation to put sobriety first in her life and was in denial as to the impact that her substance abuse had on her life and all aspects of it. Individual counseling which included components of domestic violence and relationship dependency was recommended. The counseling was to begin on September 24, 1998. There was no evidence that mother actually participated in said counseling for any period of time, however, on November 10, 1998, mother received a two year sentence from a Massachusetts court for what amounted to her tenth conviction in that state for operating a motor vehicle while under the influence of liquor.[3] Between August 25, 1981 and November 10, 1998, mother had been arrested thirteen times for said offense and had been confined on six separate occasions. Kyle was born on April 1999, while mother was serving said sentence. Mother was offered the opportunity to live in the correctional facility with her infant so long as she agreed to attend a substance abuse program. After only a few days mother failed said program and returned to the regular population, as a result of which Kyle was placed in foster care.
When mother was sentenced, the sole caretaker for Kristy was her father, however, father was unable to provide a safe and stable environment for said child. Authorities reported in early April, 1999, that father was selling illegal substances and that Kristy had been present during drug transactions. It was also reported by law enforcement officials in Massachusetts that father had been operating a motor vehicle at speeds up to 95 m.p. h. while Kristy was in the car without a car seat. Father admitted that he allowed Kristy to be cared for by an alleged cocaine user. As a result of mothers inability to care for Kristy due to her confinement and as a result of the unsafe parenting practices by father, the department obtained an order of temporary custody on April 7, 1999. The next day Kristy was placed in the foster home of C.S.
A month prior to seeking the order of temporary custody on Kristy, the department, under docket number filed a neglect petition alleging the domestic violence. substance abuse by both of Kristy's parents and the use of inappropriate caretakers by father. At the time that said petition was filed Kristy was two years and ten months of age. She was placed in foster care just a few days shy of her third birthday as a result of an CT Page 671 order of temporary custody issued on April 7, 1999. Kyle was voluntarily placed in the same foster home as his sister when he was just five days old as a result of mother's inability to stay connected to the prison substance abuse program. On May 5, 1999, the court (Mack, J.) adjudicated Kristy as a neglected child and committed her to the care and custody of the department. On September 1, 1999, said court adjudicated Kyle as a neglected child and committed him as a result of a petition filed by the department in June of 1999. In September of 1999, mother obtained an early release from her sentence. however mother was under the strict supervision of Massachusetts probation authorities and was required to wear an electronic monitor.
It should be noted that mother was compelled, due to her alcohol addiction and drunken driving convictions, to relinquish custody of a daughter from a previous relationship who was born on July 1984. In July 1988, mother was ordered to participate in a sixty day inpatient program as a result of a conviction and in the fall of 1989, mother was ordered into an inpatient alcohol center operated by the Massachusetts corrections department. again, as a result of a conviction for drunken driving. While in that mandated program, mother served concurrent sentences of ninety days and six months. In November, 1989, mother wrote a letter to a Massachusetts probate judge indicating that her goal was to learn from her errors and work on her sobriety so that she would be in a position to provide appropriate custodial care for her daughter, who required special care as she was born blind. Petitioner's Exhibit 8. In March, 1990, the court granted custody to a respite worker who was caring for the child. In 1998, the child. then age fourteen, was returned to her father. Mother has had only minimum contact with her older daughter.
On January 19, 2000, the court (Mack J) ordered Kristy and Kyle returned to mother's care and on January 21, 2000, said children were removed by the department from the foster home. Just four days after the children were ordered returned to mother's care, mother contacted C.S. and requested that she take the children for "a few days" as she was "overwhelmed" with the responsibility. Also, due to mothers probation restrictions mother was unable to leave the state of Massachusetts. C.S., therefore, drove to the residence where mother and the children were staying (with a relative) and brought the children back to her residence in Connecticut. During the months of February through July, 2000, C.S. had the children with her each week for a period of two to three days, usually on the weekends. During the month of August, 2000, C.S. had the children in her home for a period of twenty-three days with little or no contact from their mother. While the two children were cared for by C.S., her adult daughter, C.M. visited the children three hours each day they were there and, as a result of that contact, a close CT Page 672 relationship formed between C.M. and these two children. C.S. testified that she was available to take the children and made herself available to take the children in order to assure that said children were safe. During this interim, mother continued to receive state assistance from Massachusetts and collected WIC benefits. Mother testified that when all Massachusetts post-release restrictions were lifted she moved back to the Danielson area in July of 2000. Mother admitted during the trial that she ingested crack cocaine for a period of three weekends in July and August, 2000. In light of the testimony of C.S., which this court finds to be most credible, and in light of mother's admissions, this court finds the testimony of mothers friend, Vicki W, to be somewhat suspect. W was confused as to the dates, and even the years, during which mother resided in a multi-family dwelling owned by W W testified that during the period comprising the summer of 2000 (but she was not sure of the dates) the children were with mother "eighty-five percent of the time." w also admitted, however, that she was not always around to observe the children with mother due to work and familial responsibilities. Although she professed to be a "good friend" of mother. W, testified that she was unaware that mother was abusing any substances other than alcohol.
On September 3, 2000, mother walked into a variety store in Thompson. Connecticut brandishing a knife. In the process of robbing the seventy year old proprietor of said store of the sum of $260.00, in front of his fifty-six year old wife, mother cut the proprietor on the arm with that knife. Mother stated that it was father's knife and that she and father planned the armed robbery. An argument, however, ensued between mother and father; mother drove off without father and committed the crime. The very next day mother was arrested and confined under a high bond. Mother arranged for the children to again reside with C.S. and her husband. On September 12, 2000, the court (Mack J.) issued an order of temporary custody and ordered that the two children remain with C.S. On April 4, 2001, as a result of pleas of nolo contendere by father and mother, the children were again committed to the department's care and remained at the home of C.S. On May 25, 2001, pursuant to a court order and with the agreement of mother and father, the two children were removed from the home of C.S. in order to place them in the home of a maternal aunt and uncle who resided in the state of Virginia. Within three weeks of that placement the maternal aunt asked that the children be removed and declined to accept any support or respite services from Virginia and Connecticut social service departments. The children's behavior at the home of the relative was not an issue. The children were returned to Connecticut on August 13, 2001, at which time they took up residence with C.M. The children have resided at the home of C.M. and her husband since that date. CT Page 673
Prior to the children being sent to Virginia, on February 14, 2001, mother was released from confinement in order to participate in an intensive AIC program. Mother was required to report to the program five days per week and be connected to an electronic monitor. Mother was supervised by the department of adult probation. Mother was also ordered to participate in counseling through New Perceptions and to pursue full employment. Dee Roberts. who was the AIC case manager in Willimantic, reported that mother's urines were all negative and that she was very compliant with all of the AIC requirements. She did obtain employment and was receptive to instructional classes. Roberts felt that mother benefited from the pre-trial program, however, when asked at trial what motivated mother, Roberts response was "it was mandated by the court". With the cooperation of the department mother participated in an advanced behavioral health evaluation at New Perceptions in March, 2001. Corinne Valentine, the program director, testified that mother was active, motivated and made progress. All mother's urine tests were negative. Mother had a good attitude, was doing the "twelve steps" and was fully employed. Valentine, however stated that mother minimized her prior history and that mother was clearly motivated by department and criminal court mandates. According to Valentine, mother's primary desire was to regain her former lifestyle and recover material things such as her home and her horses. Once those goals were accomplished, mother would then seek custody of her two children. Valentine testified that during the evaluation, mother did not present the goals of her sobriety and regaining her former lifestyle and recovering custody of her children as a package. The attainment of her former lifestyle was clearly the first priority. Records of that evaluation reveal that mother had a history of abuse of alcohol and cocaine of two decades duration and that the father of mother's older daughter was a known drug dealer. The evaluation also contained mother's admission that at the time of the armed robbery, she was high on cocaine. Mother stated to the evaluator that she had participated in multiple substance abuse programs. mostly while incarcerated in the state of Massachusetts, and had spent a total of nineteen months in jail in that state as a result of. according to mother, four convictions for operating under the influence of liquor. The evaluator diagnosed mother as alcohol and cocaine dependent. Petitioner's Exhibit 14. Following the evaluators recommendation's, mother participated in a women's group for a period of three months and a Level II group until her sentencing. Her attendance in the mandated programs was good. however, it became more sporadic as mother's sentencing date approached. Valentine testified, however, that mother put a great deal of time and energy into her recovery. She obtained an active AA sponsor. She obtained full employment. She stayed clean and sober during the six months that she was connected with the New Perceptions Program. In a letter to the sentencing court, Valentine indicated that mother made CT Page 674 nineteen out of twenty-three sessions and was committed to recovery and becoming a productive member of the community. Mother was deemed to be "a model client." Respondent's Exhibits B and C.
Sharon Propst, who was the Danielson adult probation officer who monitored mother during her pre-trial release, testified that mother was under the "most structured pre-trial program that she had ever encountered." Propst testified that mother did well and complied with the strict court ordered conditions, including full cooperation with the AIC Program, the New Perception counseling and negative random urines. As to the disposition of the charges resulting from the armed robbery, mother negotiated a plea agreement with the state's attorney's office in Danielson that called for a recommendation of no more than five years to serve on a charge of robbery in the first degree with a right to argue for less time. On October 12. 2001, mother was sentenced to five years after serving a period of three years, followed by five years probation on the charge of robbery in the first degree in violation of Section53a-134 (a) (3). Mother is currently serving that sentence.
It is noteworthy that an alternative incarceration plan was prepared for the sentencing by the department of adult probation as a part of that department's court-ordered pre-sentence investigation. The author of that report expressed "significant reservation when considering the reckless and violent conduct concerning the offense" for which mother was convicted. The report contained statements from the proprietor's son who indicated that his father was suffering lasting effects from the traumatic experience of the robbery and that his health. one year later, continued to be impaired. Petitioner's Exhibit 15.
As to father, during the period of time that mother was released from pre-trial confinement to the AIC Program, father was cooperative with substance abuse services to which he was referred by the department. From March 11 through March 15, 2001, father attended an alcohol and drug recovery center in Hartford and later that month participated in an advanced behavioral health evaluation at United Services. Father stated that he was using from two to four bags of heroin during the period from September, 2000, to March, 2001, while his wife was incarcerated. On June 28, 2001, father was admitted to the Natchaug Hospital's detoxication program from which he was successfully discharged and then admitted to Adcare Hospital in Worcester, Massachusetts on July 3, 2001. During that evaluation father stated that he ingested eight to ten bags of heroin daily for the past two years and that he was using crack cocaine. During his stay at Adcare, however, father developed an attitude of denial and minimization and was discharged from the Adcare program on July 10, 2001, his prognosis was labeled as "guarded." From July 23, 2001 to CT Page 675 September 14, 2001, father attended the Quinebaug Day Treatment Program through Day Kimball Hospital. He was reported to be in compliance with recommendations and his attendance was good. As of November 15, 2001, the date of filing of the termination of rights petition, father was not engaged in any substance abuse treatment or relapse prevention program.
 B. Mother's Post Sentence Rehabilitative Efforts
Since the imposition of her sentence mother has been confined to the York Correctional Center in Niantic where she has taken advantage of numerous rehabilitative programs available at said institution. Mother testified that she enrolled in every class that she could as she needed to "stay out of the population. " Mother has completed the Tier I and Tier II substance abuse programs, a relapse prevention program known as "Beat the Streets", an HIV educational program, an ongoing bible study program, a victims program known as "Voices" and a parenting class. Mother has recently been admitted to the "Marilyn Baker Program" which is an intensive substance abuse program known as Tier IV. The group meets on a daily basis from 8:15 a.m. to 9:20 p. m., during which they participate in six different sessions. This Tier IV program, which is the most intensive substance abuse program that the department of correction has to offer, requires a commitment of from six months to a year, depending on the individual needs of the recipient of the benefits of the program.
 C. Dr. Murphy's Evaluation (Petitioner's Exhibit 21)
On January 8 and January 10, 2002, Dr. Kathleen Murphy, a clinical and forensic psychologist, conducted court-ordered psychological evaluations of mother and Kristy and performed interactional evaluations of mother with the two children.[4] At the time of Dr. Murphy's evaluation, mother was age forty, Kristy was five years old and Kyle was two years old. At the time of the evaluation mother had been incarcerated, post conviction, for a period of two and a half months. At said time the children had resided continuously with C.M. for a period of five months and had not resided with mother for sixteen months. It is noteworthy that in addition to the various documents which were submitted to Dr. Murphy from counsel, presumably, after the usual agreement of submission, mother provided Dr. Murphy with three letters written by her, three letters written by father and numerous letters of reference.
Dr. Murphy reported that mother married father on July 8, 1995, while the two were at a rehabilitative center in Massachusetts, while mother was dealing with her addiction to alcohol and father with his addiction to cocaine. Mother disclosed, however, that she was addicted to cocaine since she was twenty-three years old. Mother also disclosed her numerous CT Page 676 drunken driving convictions in the state of Massachusetts. Mother told Dr. Murphy that she had been sober from 1992 to 1998 during which time she married father, purchased a house and car and several horses. She stated that she thought that she was in control of her alcohol addiction. Records reveal, however, that mother's recollection of her years of sobriety was somewhat optimistically stated. Records reveal that mother was arrested in the later part of 1992 for drunken driven and that she was sentenced to a period of sixty days to be served at a Massachusetts alcohol facility in Longwood in 1993. Records also reflect that mother was convicted of operating under the influence in May of 1998. Mother disclosed to the evaluator that during the period of January, 2000, through July, 2000, the foster mother, C.S., had the children for at least two days a week usually on weekends. as on weekends, she and father smoked crack cocaine. As to her alcohol abuse, mother admitted to the evaluator that "I can't predict what will happen when I drink." Mother disclosed her intention to reunite with father, if father remains sober for a period of one year, then changed the estimate to a two year period. Mother made this statement despite the fact that in January 2002. father sold everything they had including the motor vehicle, the furniture and all of the children's toys, in order to make bond and to buy drugs.
Dr. Murphy reported her observations of the interaction between mother and Kristy. Kristy ran to mother's open arms, stopped and asked for presents. When told by mother that there were no presents. the child folded her arms. pouted and walked away. The child stated to mother in the presence of the evaluator, in making reference to C.M., "she's my special other mom because you're in prison. " On parting, mother again opened her arms and the child simply patted the mother on the head and walked away. As to Kyle, when mother asked for a kiss, he ran away. When mother expressed to both children, "I love you," there was no response from either. When mother requested hugs and kisses from both children there was no response from either.
In her evaluation of mother, Dr. Murphy concluded that mother suffered not only from alcohol and cocaine dependence but a dependency disorder. Commenting on said disorder, Murphy saw it as "a pervasive and excessive need to be taken care of that leads to submissive and clingy behavior." Murphy also noted mother's significant history of antisocial behavior which the evaluator characterized as "a chronic pattern of disregard for and violation of rules and standards in adulthood." Murphy concluded that reunification with mother was not in the children's best interest. Murphy noted mother's history of repeated treatment failures and relapses and noted that mother's sobriety was enforced only when mother was under court-ordered conditions or mandates as a result of incarceration. Murphy CT Page 677 noted that mother lacked the ability to manage anger and violence, that these were problems associated with her addictions, and that she evidenced poor insight as to the consequences of said addictions on her children.
Murphy was impressed with mother's brief history of participation in the various programs offered at York. however, Murphy noted that mother's participation was, again, in a controlled environment. Commenting on mother's history, Murphy concluded as follows:
 However, her history which includes failure to remain sober during the first three months and last month of pregnancy with her older daughter, failure to remain sober despite losing custody of said daughter due to substance related criminal offenses and incarcerations, several treatment failures. romantic involvement with chemically dependent partners, a family history of alcoholism, and a failure to participate in substance abuse treatment without legal involvement, suggest a significantly greater likelihood of relapse in the absence of a controlled environment. If Kristy and Kyle are reunited or have unsupervised contact with [their mother], then their safety may be endangered by exposure to her substance abuse.
Murphy noted that mothers current incarceration for armed robbery was "consistent with her nineteen year pattern of disregard for societal rules and standards, violation of rights of others, conflict with authority figures and reckless behavior." Murphy opined that the children were at "high risk" of physical and emotional harm by exposure to mother's potential for further antisocial behavior. Murphy added that mother's relationship histories and dependency traits impaired her ability to protect herself and her two children. Indicative of these concerns was mother's predicted reconciliation with father despite father's physical abuse of mother and father's continuing drug dependency. Murphy was concerned that mother displayed a pattern of poor judgment, placing her own needs in front of the needs of her children by choosing partners with histories of criminal behavior, domestic violence and chemical dependancy.
During her evaluation of Kristy, Dr. Murphy observed that Kristy was "distant" from her mother and spent much time in solitary play. Kristy was uncomfortable discussing her mother and father and made no reference to them in any of the projective testing by the evaluator. Murphy noted that Kyle appeared to be more emotionally connected to mother and played with mother throughout the visit. Murphy also noted, however, that there was no spontaneous hugging or kissing by either child at the end of the visit. During the evaluation, Kristy referred to C.M. as "mom" and CT Page 678 referred to C.M.'s husband as "dad." The child's drawings reflected that C.M. was a "key figure in her life." Murphy noted Kristy's feelings of insecurity as to the permanency of her current placement.
Murphy reported that in the interactional assessment with mother, Kristy appeared to be parentified in that much of her pretend play centered around taking care of the needs of her baby doll, her mother and her brother. This gave the impression that this was once a part of Kristy's daily responsibilities; mother even referred to Kristy as "Miss Susie Homemaker."
It is noteworthy that subsequent to the evaluations, Dr. Murphy received three more letters from mother, one submitted by an AA acquaintance, another submitted by Ms. W and another submitted by mother. Mother wrote that she would file divorce papers against father and that she was hoping that she would be released from prison in October 2002 . . . after serving only one year of a three year sentence! Despite review of that unsolicited information, Dr. Murphy concluded:
 Although [mother] plans to refrain from substance abuse and separate from her husband, has support from family and sober friends, and will be monitored for a period of five years following release from prison, a history of chronic poly substance dependant, repeated chemical dependancy treatment failures and relapses, extensive criminal behavior, violence, romantic involvement with chemically dependant partners, and unaddressed mental health issues suggest that the prognosis for [mother's] ability to rehabilitate and to provide a stable, safe and nurturing home environment for her children to live or visit is poor.
During the trial Dr. Murphy opined that based upon her evaluations and her observations of the interaction between Kristy and mother, that Kristy is very confused as to the relationship and exhibited "conflicted loyalties", although Dr. Murphy felt that a bond did exist between mother and Kristy.
 D. Kristy's Therapists
As indicated, Kristy and Kyle were placed for a second time in the care and custody of C.S. when mother was arrested on September 4, 2000. They remained with C.S. and visited daily with C.M., until their removal to Virginia on May 25, 2001. During that interim Kristy disclosed significant and numerous incidents of violence between mother and father and disclosed viewing scratches on father's face. Kristy also disclosed that her father viewed adult movies with the child in his bed. C.S. CT Page 679 reported that Kristy was not verbally emotional" and "accepts everything that occurs in her little life."
Donna Anastasio, a therapist who works for United Services in Dayville, treated Kristy from October 2000 to May 23, 2001, when the child was placed with the maternal aunt and uncle in Virginia. The presenting problems, according to said therapist, were the conflicted relationship with mother and father, the child having been in and out of her parent's care, and mother's incarceration. Kristy was bitting and throwing things at her little brother. One minute it was reported that Kristy was loving and nurturing and the next minute angry, sporadic and irrational. An adjustment disorder was diagnosed. Anastasio testified that Kristy was conflicted when she attempted to speak of her mother. The therapist stated that it was difficult for the child to see mother in prison and to speak with mother on the phone. The child had refused on occasion to speak with mother on the telephone as she said it was "too sad." Anastasio testified that the goal of the treatment with Kristy was to reduce the effect of the separation from her parents and to gain an internal stability. She spent a total of twenty-two sessions with the child and is now the supervisor of Kristy's current therapist. Her treatment of Kristy ended, as indicated, with the move to Virginia which was supported by mother and father but which was not supported by Anastasio who believed "it would be a miracle if the placement went well." The therapist testified that she voiced her concerns to the department as Kristy did not know the relatives in Virginia and it did not appear to be a good setting for the child.
Once the therapist was informed by the department that the Virginia placement failed Anastasio recommended that the two children be placed either with C.S. or C.M., noting that Kristy often mentioned C.M. and "idolizes C.M." As indicated, both children, upon their return from Virginia, were placed with C.M.
Upon her return to Connecticut, Kristy again engaged in therapy through United Services, however, this time, with a different therapist, as Anastasio had been promoted to a supervisory position. Nancy Grandelski, Kristy's current therapist, conducted nineteen sessions with Kristy from August 2001 through July, 2002. At the time of her return from Virginia, Kristy was experiencing nightmares. enuresis, aggressive behaviors and an inability to focus. The counseling goal at that time was to normalize the child's emotional state and to help her with the recent transition. By the time the therapeutic sessions with Kristy ended in July 2002, Kristy was at the top of her kindergarten class, her nightmares and bed wetting was gone; she was experiencing no problems at school and acting out had ceased. In short, the goal was accomplished and her emotional state was CT Page 680 normalized. Grandelski stated that C.M. is an "expert" on the two children has always done what is best for them and has done a "remarkable job." She opined that the two children are comfortable and secure in the home with CM., her husband, and their six month old baby, whom Kristy loves as her baby brother. Grandelski testified that Kristy has a parental bond with C.M. and her husband and refers to them as "mom and dad."
As to Kristy's relationship with her mother, Grandelski testified that the child never mentioned mother spontaneously and, on many occasions, when the therapist broached the subject, the child refused to discuss her mother. It was this therapist's unfortunate duty to inform Kristy in October 2001 that her mother was going back to jail . . . the child offered no reaction. Grandelski testified that, in her opinion, the bond between mother and Kristy was "insignificant."
As to the ongoing visitation with mother, Grandelski indicated that often the child could not address the visits and never referred to her mother or father unless prompted by her. The therapist was told by the child that she preferred to "stay home and play with her kitten". Kristy did not like to go to the prison. Grandelski opined that the visits were very stressful for the child and that there was nothing gained therapeutically from them. Kristy refers to her mother by her first name and has stated to the therapist that she wished to live with C.M. "forever." These statements were made by the child despite being instructed by her mother to call C.M. "aunt" and her mother "mom." The child's response to this instruction, according to the therapist, was to state that she doesn't have a real mother; Kristy continued to call C.M. "mom." Anastasio, who, as noted. is now Grandelski's supervisor, has kept herself informed as to Kristy's therapy. She testified that the child "brightens up when she speaks of C.M.," Anastasio added that the children are nurtured, cared for and are comfortable with C.M. They are safe and secure in her home. CM. has provided for all their needs since they were placed in her care in August 2001. Anastasio testified further that both children look to C.M. for nurturing, guidance and for approval of whatever they are doing. Both therapists agreed that each child sees G.M. as their mother and the children now refer to C.S. as "granny."
 E. Visitation
Joanne Guay is a department aide who supervised visitation and transported the children to various visits with mother and father. The first series of visits supervised by Ms. Guay was from October 22, 1999, when mother was living with a relative in Massachusetts and under very strict post-conviction monitoring, until January 22, 2000, when the CT Page 681 children were ordered returned to mother. The next period during which Ms. Guay supervised visits was from September 12, 2000, when the order of temporary custody issued subsequent to mother's arrest and incarceration, through August 30, 2002, when the children were visiting mother at York. Guay testified that Kristy would always greet mother by asking for presents and that the interaction between mother and child was mostly horseplay. Guay testified that there was no spontaneous affection of the child toward her mother and that, after the visited concluded. Kristy would run to C.M. and hug her. Guay was witness to many telephone conversations between mother and Kristy which occurred after father would visit the children at the department office by pre-arrangement with York. Although the child had up to ten minutes to speak with mother, the child most often cut the conversation short. Guay supervised a total of twelve visits between the children and their mother, six of them at the York Correctional Center. Guay added that Kyle often followed his sister's lead; in other words, he would simply do what his sister did. Guay also supervised twenty-five visits between father and the two children and testified that the interaction between father and the children went well and that the children enjoyed the visits. Prior to his consent to terminating his parental rights, father's visits were at the department office every two weeks for one-and-one-half-hours. Thereafter, father's visits were reduced to once a month. Since mother's phone calls to the department office were made after the children completed their visit with father, once father consented to his termination, mother's phone calls were cut in half by the department. During the trial, the court asked counsel to be prepared to I argue, after the conclusion of the evidence, the issue as to whether the visits between the children and mother should continue, while the court reviewed all of the testimony, the numerous exhibits and prepared to render its decision on the termination petition. At the conclusion of the evidence, the court did hear argument on this issue and, after considering those arguments, rendered a decision thereon. The court first informed mother that it was leaning toward granting the termination of her parental rights as requested by the department, however, the court pointed out to mother that the state had a heavy burden to meet on several significant issues and the court needed to review in detail all of the evidence before making a final decision. The court also pointed out to mother that it was allotted 120 days to deliver the decision and that is why the court felt that it should deal with the issue of continuing visits prior thereto. The court then issued an order suspending all visitation between the children and mother pending the termination of parental rights decision. The court ordered that telephone contact between the children and mother continue on two occasions per month, pending the ultimate decision. The court, however, cautioned mother not to engage in any adult or inappropriate conversations with the children. As neither father nor CT Page 682 father's attorney participated in the termination trial, the court did not order any suspension of father's visits with the children. however, the court highly recommended that said visits cease. Prior to rendering the interim visitation decision, the court discussed the salient points which will be briefly highlighted herein.
At the time the evidence was concluded, visitation by the children with mother occurred one time per month at York for one-and-a-half to two hours. Transportation was provided by C.M. and the visits were supervised by the department. Mother was permitted, by arrangement with York, to speak with the children at the conclusion of father's visits. Dr. Murphy had testified on this issue that there was likely little risk of emotional or physical harm associated with continued supervised visits for both mother and father. Dr. Murphy recommended that both respondents have post termination contact with their children, which is something that this court is powerless to order. Anastasio testified that Kristy appeared conflicted when she spoke of her mother and had difficulties speaking with her on the telephone and seeing her in prison. As indicated, Anastasio testified that seeing mother was damaging internally to Kristy and not healthy for said child. Anastasio recommended the cessation of all visits and all telephone contact. Grandelski added that Kristy is now stabilized. She stated that Kristy had made tremendous progress in the foster home, had put the past in its proper place and exhibited no more concerning behaviors. As noted, Grandelski felt that the bond between Kristy and her mother was insignificant. She opined that the visits at the prison were very stressful on said child and that any future visits should occur only if Kristy desired the same. She felt strongly that Kristy needed to put and has put the past where it belongs. This court has noted mother's instruction to Kristy that the child refer to mother as "mom" and that she refer to C.M. as her aunt, aninappropriate instruction which only adds to the child's conflict. Ms. Guay. in her supervision of the visits between mother and Kristy, saw no spontaneous affection. With Kristy. the visits were about presents. Guay noted the short duration of the phone calls. C.M. testified that the visits were hard on Kristy and that they were disruptive to the child's life. C.M. testified that she was instructed by Kristy not to tell her of the visits until one-half hour before. C.M. "confirmed that Kristy never mentioned the visits after seeing her mother. C.M. confirmed that Kyle does what Kristy does. The department felt that termination of the visits pending the ultimate decision by the court was in the best interest of both children.
Mother strongly insisted on retaining the visits. Mother pointed out that the environment of "the Marilyn Baker program is much more conducive to parental visitation. There is a visiting room which is a solarium with CT Page 683 a family setting consisting of a rug and a playroom and no correction officers "hovering over" during the visit. Mother indicated that there was a girl scout program available two nights per month for the inmates and their daughters. Mother, contrary to the testimony of other credible witnesses, indicated that, during the visits, the children fight for her attention, that the visits are pleasant for the children and that, lately, the visits are "better and "better". Mother felt that the new situs of the visits would improve the visitation experience. The court pondered "better and better" for whom?
The court considered mother's testimony. The court also considered the uncertainty of the court's decision and the pressure that it exerted on everyone that could spark further inappropriate remarks by mother to the children. Such remarks would only add to the children's conflict relative to their permanent home and would, in the court's view, provide an unneeded and unwanted source for more relationship conflict within the children. The court was especially concerned with the mixed message that would be sent to the children from the improved surroundings that would threaten to undermine the strong bond that the children have with G.M.
As to father, his disturbing history of substance abuse, criminal involvement and probable complicity in mother's armed robbery gives this court great concern as to continuing visits between him and his children. Even though these visits are at the department offices and not at a prison, and even though they are supervised, the court could have simply terminated father's parental rights at the conclusion of the evidence and, thereby, any visits as a result thereof. Given the fact, however, "that neither father nor his attorney were present in court for the termination trial, and, therefore, received no notice on the visitation issue and had no opportunity to argue the same, the court recommended that father's visits cease and left to the department, with major input from C.M., the decision as to what, if any, visitation should continue.
 IV ADJUDICATION
For the purposes of adjudication, the court is limited to a consideration of those events which preceded the filing of the termination petition. Practice Book § 33-3(a) [now § 35a-7 (a)]. The adjudication date is therefore November 16, 2001.[5] The disposition date is the date that the trial concluded and that the decision was reserved which was October 3, 2002.
 A. Reasonable Efforts
CT Page 684
Prior to the court's consideration of the statutory grounds alleged by petitioner to provide the basis for termination of mother's parental rights and prior to consideration as to whether such termination is in the best interest of Kristy and Kyle, this court must consider the "reasonable efforts" findings required by § 17a-112 (j) (1). That section provides that in order for the court to grant the termination petition, it must find, by clear and convincing evidence, that the department has made reasonable efforts to locate the parents and to reunify the child with the parent's. In lieu of that finding, the court may find, by clear and convincing evidence, that the parents are unwilling or unable to benefit from reunification efforts.
 1. Previous Court Findings
The cited section also states "provided such finding is not required if the court has "determined at a hearing pursuant to subsection (b) of section 17a-110 . . . that such efforts are not appropriate." The cited subsection refers to a determination by a court as to the appropriateness of continuing efforts "at a hearing held in accordance with subsection (k) of section 46b-129."
As noted previously, the court (Mack J.) on September 12, 2001, found that further efforts by the department to reunify these children with their parents were no longer appropriate. On that date. § 46b-129 (k) (2) made no provision for the quantum of evidence required for the court to make such finding. All that was required, as of that date, was a hearing at which the court is obligated to consider the child's best interests and need for permanency. After hearing from counsel and in mother's presence, the court made such finding. However, Section 7 of Public Act 01-142 amended § 46b-129 (k) (2) to provide that in order for the department to cease making efforts to achieve parental reunification the court must find that such further efforts would be inappropriate "upon clear and convincing evidence" at a permanency hearing. No such finding was made subsequent to the cited amendment or subsequent to the date the petition was filed (November 16, 2001)' although the court (Mack J.) found on March 5, 2002 that reasonable efforts were made by the department for the two children to return home and to achieve the permanency plan previously approved by the court.
In its argument the petitioner asserted that it had proven by clear and convincing evidence all three of the statutory alternatives, including the previous findings by the court, that would preclude this court's inquiry into the other two statutory alternatives. Given the importance of this issue to the determination to be made in this case and given the significance of the aforementioned changes to the statutory standard of CT Page 685 proof, made after the "no further efforts" finding, this court will hold the petitioner to its statutory obligations and will determine whether the petitioner has proven, by clear and convincing evidence, introducedduring the trial, that the department has made reasonable efforts to reunify these two children with their mother or that mother is unable or unwilling to benefit from such efforts.
2. The Department's Efforts
In the termination petition. the department alleges that it has made reasonable efforts to reunify Kristy and Kyle with the respondents, but the respondents are unable or unwilling to benefit from such efforts. The Appellate Court has referred to the word "reasonable" in this statutory context as the "linchpin" in adjudging the efforts by the department under the circumstances of the particular case. The court has stated that the department's obligation hereunder is to do everything reasonable and that the department is not expected to do everything possible. In reRachel M., 58 Conn. App. 448, 450 (2000); In re Eden F., 48 Conn. App. 290,311-12 (1998). rev'd on other grounds, 250 Conn. 674 (1999). Reasonableness is an objective standard and the issue of whether the efforts made by the department were reasonable depends upon the court's consideration of all of the circumstances of this case. In re AntonioM., 56 Conn. App. 534, 537 (2000). In re Hector L., 53 Conn. App. 359,372 (1999).
Throughout its involvement with this family, from the spring of 1999, up to and including the date that the termination trial commenced, the department has provided numerous services for mother and father. Said services consisted of case management, individual counseling, substance abuse evaluations and treatment, urinalysis, parenting classes, and transportation to various venues in Massachusetts and Connecticut for visitation purposes. In addition, the department has paid for the professional evaluations performed by Dr. Murphy. The services provided to mother and father during mother's confinement in 1999, consisted of transportation for visitation purposes and evaluation and counseling through United Services and resulted in the children being returned to the respondents' care in January 2000. The department's efforts prior thereto were obviously fruitful.
As to father, court-ordered steps were issued in May, 1999, which ordered that father participate in individual drug and relationship counseling through United Services and that father not abuse alcohol or drugs and refrain from any criminal involvement. It was not until after mother's pre-trial release in the winter of 2001, that father engaged in the court-ordered services. As noted. father underwent an advanced CT Page 686 behavioral health evaluation through United Services in March, 2001, that resulted in his participation in the Natchaug Hospital detoxification program, followed by his inpatient treatment through Adcare Hospital in Massachusetts, followed by his outpatient treatment at Quinebaug, that lasted until September 14. 2001. As previously noted, father has not engaged in any further substance abuse treatment or after care program. Despite having the opportunity afforded to him for individual counseling and parenting classes, there was no evidence that father took advantage of these Opportunities offered to him by the department. Apparently, once mother was sentenced to a prison term for the armed robbery, father disengaged from any further services offered by the department, other than visitation. Father, due to a chronic neck problem that resulted from an injury several years ago and prohibits any employment, and due to decades of drug abuse, is in no position to provide appropriate care for these two children. Father has so stated. This court finds that the department has proven, by clear and convincing evidence, that it provided the services necessary to reunification of these children with the father and that father is unwilling or unable to benefit from said services.
Among the services provided to mother by the department were case management, substance abuse evaluation and treatment, parenting courses and individual counseling through New Perceptions. The department has consistently throughout its involvement provided mother with visitation services, whether she was in prison or out. As noted, mother was in a Massachusetts prison when the department first became involved with this family having been sentenced to a term of two years in November. 1998. As also noted, mother obtained an early release in September of 1999. and from her release date until reunification was achieved, the department provided transportation and visitation services. This court has already detailed the minimal parental responsibilities performed by mother between January, 2000. the time of the return of her children. supposedly to her care, and September. 2000, when mother was arrested and charged with the armed robbery. Mother was confined under a high bond from September, 2000. until her release to alternative incarceration in February 2001. during which time the department continued to provide transportation and visitation services. During the period of her pre-trial release from February, 2001. until her incarceration under sentence in October 2001, the department, in full cooperation with probation authorities and the AIC Program, provided the advanced behavioral health evaluation through the United Services. That evaluation resulted in mother's participation in the New Perceptions outpatient group programs and urinalysis testing through United Services After mother was sentenced for the armed robbery, the department continued to provide transportation and supervised visitation services. CT Page 687
As to mother, therefore, this court finds that the petitioner has proven by clear and convincing evidence that it has provided the services necessary for her reunification with her children. Unfortunately, during mother's incarcerations in the state of Massachusetts and in Connecticut, the department was limited as to the services it was capable of providing. Services necessary to deal with mother's decades of substance abuse, relationship difficulties and antisocial behaviors must be provided through the department of correction while mother is confined and under the jurisdiction of said department. While so confined, mother has, indeed, taken advantage of various rehabilitative programs offered through said department. From the evidence presented at trial, including mother's own testimony. it is clear that mother is committed to engaging in necessary rehabilitative services with the view toward shedding her drug and alcohol dependency and controlling her antisocial and criminal behavior. The testimony shows that mother is clearly benefiting from the services offered during her confinement. The critical question. however, is whether mother would be capable of reaching the level of rehabilitation necessary for her to properly parent her two children,given the age and the needy of said children. 
 B. Failure to Rehabilitate
Petitioner alleges that mother has failed to achieve that level of rehabilitation necessary to be a responsible parent to her two children. Petitioner also alleges that there is no on-going parent child relationship between these two children and their mother. Before this court reaches the issue of whether termination of mother and father's parental rights is in the best interests of said children, the petitioner must prove by clear and convincing evidence, as to mother, one of the two statutory grounds alleged.
 In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun.
In re Eden F., supra, 250 Conn. 689.
General Statutes § 17a-112 (1) (3) (B) (i) allows for the involuntary termination of parental rights when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time. considering the age and needs of the child, such parent could CT Page 688 assume a responsible position in the life of the child . . . "In reStanley D., 61 Conn. App. 224, 229 (2000).
 To terminate parental rights for failure to achieve rehabilitation, both prongs of the test incorporated in § 17a-112 (j) must be met: one, that the parent has failed to achieve rehabilitation and two, that there is no reason to believe that the parent could assume a responsible position in the life of the child within a reasonable time, considering the age and needs of the child."
(Emphasis in original.) In re Danuael D., 51 Conn. App. 829, 843 (1999).
Our Supreme Court has defined "rehabilitation" as follows":
 `Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her Former constructive and useful role as a parent . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child. and Further, that such rehabilitation must be foreseeable `within a reasonable time.' Rehabilitate' means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child unaided by available support systems. It requires the court to find by clear and convincing evidence, that the level of rehabilitation she has achieved, if any. fall short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(Citations omitted; internal quotation marks omitted.) In re Eden F.,
supra, 250 Conn. 706.
The statute mandates that the court consider "some future date," insofar as parental rehabilitation is concerned, as reasonably achievable, given the age and the particular needs of the children. A parent's personal rehabilitation is to be determined, in part, by the extent to which he or she has complied with the specific steps issued by the court, which provide a warning to the parent as to the possible consequences of the failure to comply. In re Shyliesh H.,56 Conn. App. 167, 179 (1999).
In assessing rehabilitation, the issue is not whether a parent has improved [her] ability to manage [her] own life but whether [she] has CT Page 689 sufficiently achieved the ability to meet the particular needs of her [children]. In re Shyliesh H., supra, 56 Conn. App. 180. The court must review. therefore, the past and present status of Kristy and Kyle and assess the parenting abilities of mother from an historical perspective. See In re Tabitha P., 39 Conn. App. 353, 361 (1995).
In a recent case decided in this court. Judge Levin referred to the exception which applies to Practice Book § 33-3(a) when failure of a parent to rehabilitate is alleged as the statutory ground for termination:
 A claim of failure to rehabilitate implicates a judicially created exception to the Practice § 33-3 (a). that "[i]n the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." "Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, we have determined that with regard to termination petitions brought under § 17a-112 (c) (3) (B), [now § 17a-(j) (3) (B)], the trial court may in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of the statute. . . . In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time."
(Citation omitted.) In re Samantha C., Superior Court, Child Protection Session at Middletown
(July 18. 2002. Levin, J.) (32 Conn.L.Rptr. 559, 562), quoting In reLatifa K., 67 Conn. App. 742,
748-49, 789 A.2d 1024 (2002).
1. Mother's Rehabilitative Status as of the Adjudication Date (November16, 2002)
Prior to assessing mother's rehabilitative status, it would be helpful to the court's analysis to mention the concerning behaviors. practices and lifestyle from which mother required rehabilitation. What did mother need to correct so as to be in a position to provide safe and appropriate care for her two children? When the department became initially involved in the fall of 1998, mother was serving a prison term. Mother CT Page 690 had-recently been convicted, for a tenth time, of the offense of operating a motor vehicle while under the influence of liquor. Mother was, at that time, serving her sixth confinement For that offense. Father was unable to provide appropriate care For the children as he was allegedly selling illegal substances and was abusine said substances. Father was also engaging inappropriate caretakers For Kristy. When the department became re-involved in the Fall of 2000, two years alter the departments initial involvement with this Family. mother was again incarcerated, this time for a much more serious offense. Mother's convictions for operating under the influence date back to 1981 when she was twenty years of age. Mother disclosed to Dr. Murphy that she had been addicted to cocaine since she was age twenty-three. Mother's relationship history consisted of violent and substance abusing partners. Mother had lost custody of her older daughter due to her substance abuse addictions and antisocial behaviors. The evidence shows that on only one occasion in mother's two decade addiction to alcohol, did she voluntarily enroll in a substance abuse program. She admitted herself to a detoxication center in Worcester. Massachusetts in 1985. Since that time, mother has participated in several substance abuse and therapeutic programs. however, all of such programs have been mandated by a court as a condition of a sentence of imprisonment. Mother was ordered to participate in an alcohol abuse program operated by Massachusetts correction authorities in western Massachusetts in 1989. The program was supposed to last for a ninety day period, however, mother obtained an early release in thirty days. In the early 1990s, mother participated in another correction mandated program in Longwood. Massachusetts during which she met father. That program was supposed to last for 150 days; mother obtained an early release in forty-five days. Mother did not connect with any aftercare programs when she was released from either of the correction mandated substance abuse programs. Mother claimed that she remained sober. without any therapeutic assistance, from the year 1992 through the year of 1998, however records show that on October 5, 1992, mother was arrested and charged with operating under the influence, as the result of which she received a sentence of 115 days. Records also show that on May 18, 1998, mother was arrested For operating under the influence of liquor and. again, on June 15, 1998, mother was arrested for the same charge which resulted in a two year sentence. The history clearly shows that unless mother was threatened with incarceration or was actually incarcerated, mother did not address her substance abuse and behavioral issues. Despite being arrested and convicted and confined on numerous occasions for operating under the influence of liquor and despite the loss of her oldest daughter and the loss of custody of Kristy and then of Kyle. mother continued to abuse alcohol and continued to ingest crack cocaine. In fact, the dangerous combination of alcohol and cocaine affected mother to such an extent that she was driven to commit CT Page 691 an armed robbery and an assault with a knife on an elderly gentleman. That event, as noted, took place on September 3, 2000. That event, which mother claims "changed her life" took place after Kristy and Kyle were removed and then returned to her care.
As earlier noted herein, mother obtained a pre-trial release in February, 2001, and as a result was under the close supervision of the criminal court, the department of adult probation and the alternative incarceration program. Mother fully cooperated with services arranged through the court and through the petitioner and participated in the programs offered by New Perceptions and United Services. Mother obtained full employment and complied fully fully with her conditions of release. At her sentencing. mother presented the court with letters from the New Perceptions therapist indicating that mother fully participated in the programs offered, was motivated and was active in groups. At that sentencing, mother presented the court with a letter from her employer, the Rogers Corporation, indicating that mother was a hard-worker and had a "bright future with the company." At her sentencing the court was provided with the urinalysis results from fourteen different tests that were administered to mother during the six month period of her pre-trial release. all of which were negative.
As a result of the robbery which occurred on September 3, 2000, mother was charged with three separate offenses: robbery in the first degree, in violation of General Statutes § 53-134: assault in the second degree on an elderly person. in violation of General Statutes § 53a-60b; and larceny in the fifth degree. in violation of General Statutes §53a-125a. Robbery in the first degree is a B felony and carries with it a maximum sentence of twenty years in jail. If one is convicted under subsection (a) (2) of 53a-134. i.e., robbery in the first degree with the use of a deadly weapon, the court must impose a minimum five year sentence that is not suspendable. Mother was convicted under subparagraph (a) (3) which means that she was charged with using, not a deadly weapon. but a dangerous instrument, that instrument being a knife. The original charge of assault in the second degree on an elderly person is a D felony which carries with it a maximum prison term of five years. however assault in the second degree on an elderly person mandates a minimum confinement of two years that is not suspendable by the court. Larceny in the fifth degree carries with it a maximum sentence of six months. Thus. as of her arrest date, mother potentially faced a term of imprisonment of twenty-five-and-one-half years and potentially faced a minimum mandatory confinement of seven years.
Given mother's demonstrated history of cooperating with those authorities whom either have threatened incarceration or have imposed CT Page 692 incarceration, this court is not at all surprised by mother's laudable performance during the pre-sentenced period. In light of that performance, mother was able to negotiate a plea bargain wherein she faced. at the most, a five year incarceration, with a right to argue For less. As a result of that performance, despite the commission of a violent crime with lasting adverse consequences to the victim and despite mother's horrible Massachusetts record of drunken driving convictions, mother received a sentence of three years. Given mother's history of performing well while under the watchful eves of the criminal justice system. coupled with the real possibility of long-term incarceration, this court has no doubt as to the motivating force which propelled mother's pre-sentence performance. Mother's goal was to receive the least possible term of incarceration.
Given mother's failure to connect with any therapeutic and/or substance abuse relapse prevention programs, or for that matter, any programs that would improve her parenting abilities, despite the removal from her care of all three of her children, this court finds that any goal of becoming an appropriate parental source for Kristy and Kyle. as a motivating force for mother's presentence performance, was relegated to a low priority.
 In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courthouse door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct."
(Internal quotation marks omitted.) In re Carissa K., 55 Conn. App. 768
(1999).
This court, therefore, finds that the petitioner has proven by clear and convincing evidence the first prong of the statute, namely, the failure of mother to achieve the requisite rehabilitation level as of November 16, 2001, the adjudicatory date.
2. Post Adjudicatory Events
In order to properly consider the second statutory prong the court must address two questions posed by the statute. The first question is whether mother is capable of achieving that degree of personal rehabilitation necessary For her to assume a responsible position in the lives of her children. If that question is resolved in the affirmative. the next question is whether that achievement can be accomplished within a reasonable time, considering the age and the needs of each of her CT Page 693 children. As noted, in its consideration of this foreseeability issue, the court may rely on post adjudicatory events.
In order to address the first question, the court must assess mother's rehabilitative efforts after the filing of the termination petition. Mother participated in practically every appropriate rehabilitative program available through the department of corrections, including the Tier I and Tier II substance abuse programs. Mother currently has been accepted and is enrolled in the Tier IV intensive substance abuse program. In addition, mother has completed a parenting class program. has obtained an AA sponsor and has participated in bible study.
The Tier I program was completed on November 26, 2001, and consisted of six one hour sessions. The Tier II program is a forty-two hour program given over a period often weeks. From January 23, 2002, through April 15, 2002, mother participated in said program. however, as a result of a disciplinary action, mother was prohibited from re-engaging in the program until May 29, 2002. Thereafter, on August 26, 2002, mother did successfully complete the Tier II substance abuse program. The discipline involved possession of "contraband" and resulted in punishment segregation for a period of fifteen days and loss of community privileges for a period of ninety days. The discipline resulted from mother requesting too many pills or inappropriate medication while in the "medline."
Mother's admission to the Tier IV program, however, is indicative of her incurring no disciplinary action since April, 2002, as she would not have met the eligibility requirements for the intensive program had she been at a higher disciplinary level. In Fact, mother is currently at the lowest disciplinary level achievable while one is incarcerated. According to the department of correction records, mother's intake evaluation revealed that she had a significant need for intensive and extensive substance abuse treatment. Stephen Meigs, who is a counselor at York, testified that mother "lacks patience" when it comes to satisfying her particular needs.
Mother states that the event which occurred on September 3, 2000, i.e., the armed robbery, was a low point in her life and that she is "ashamed" of her participation in that event. Mother-is committed, upon her release, to engage in whatever therapeutic and substance abuse relapse prevention programs might be made available to her on the outside. Mother points out that she has been sober for a period of over two years, however, this court must point out that said sobriety has been maintained as a result of mother either being incarcerated or being under a threat of long-term confinement. Mother has applied for early release CT Page 694 into a half-way house program which would provide the necessary substance abuse relapse prevention treatment. Mother is seeking an early parole release to a half-way house which cannot be obtained until she achieves Level II, which mother is hoping to achieve by March, 2003. Mother points out and department of correction records confirm, that mother would be eligible for parole on November 17, 2003; as of that date. she would have served eighty-five percent of her sentence. Mother's maximum release date, however. is April 30, 2004. Mother asks this court to assume that she will achieve early release, be admitted to a half-way house program, successfully complete that program within the relatively near future and be in a position to provide appropriate care for her children. Meigs, however, stated that her early release to a half-way house on early parole was "completely speculative." This court cannot and will not engage in speculation as to matters over which the department of correction has exclusive control.
As our courts have recognized there is no entitlement to rehabilitative programs while incarcerated. See Wheway v. Warden, 215 Conn. 418, 431
(1990). Prison authorities have Full discretion to grant or deny early release programs and to control certain conditions of confinement. including eligibility for various rehabilitation programs. See Smith v.Liburdi, 26 Conn. App. 254, 259 (1991), cert. denied, 221 Conn. 910
(1992).
This court cannot speculate, as mother asks it to do, as-to what could happen in the event that she is successful in her attempt to obtain early release. See In re Shane P., 58 Conn. App. 234, 243 (2000).
Dennis Knapp, who is a relapse prevention counselor at New Perceptions, had the responsibility of monitoring mother's participation in the program through AIC. He testified that he believed that mother had a "good chance for recovery." It is noteworthy that Knapp became so acquainted with mother and father that he is now father's roommate. Knapp. however, also testified that. in his experience, only thirty percent of the participants in the program "make it" meaning attain total sobriety; the converse of that, of course, is that seventy percent of the participants fail. Valentine was a little more optimistic in her predictions in that she testified that forty percent of the participants in the program "remain clean", however. Valentine cautioned that mother's history of alcohol abuse. cocaine abuse, and criminal behavior was significant and testified that mother needed to resolve the "triggers and traps" which occasion mother's aberrant and antisocial behaviors. Stephen Conair, a counselor at the department of correction testified that mother's chances of achieving full sobriety were "good" if she stayedconnected to the necessary rehabilitative programs.
CT Page 695
Murphy, however, opined during her testimony, that mother's chances of maintaining complete sobriety were, in her view, "poor." Her opinion was based upon mother's history of no engagement in any therapeutic or substance abuse programs without the involvement of the criminal justice system. Murphy testified that in the absence of a controlled environment mother's prospects for rehabilitation were poor. Murphy reported that mother would have to face "significant stressors" that in Murphy's view, would work against her recovery. Mother would have to rely on friends to find a place to live. Mother would have to find a job. She lacks any furniture or clothing or money. When the two children were returned to her care in the past, the parental responsibilities overwhelmed her. Finally, the evaluation revealed that mother has a low tolerance for stress and pressure and that mother is rigid and inflexible in attempting to resolve the problems in her life. She has. in the past. escaped those problems through substances. Murphy concluded that mother, in order to appropriately deal with the stresses of life, will require significant individual psychotherapy as well as relapse prevention therapy while maintaining sobriety.
Given mother's history of connecting with appropriate supportive therapeutic services only when faced with actual incarceration or the threat thereof, the ultimate test of mother's ability to achieve the rehabilitation level that would be necessary in order for her to provide a proper. safe and nurturing permanent home for her children, could not be taken until such time as all restrictions, now imposed upon her by the criminal justice system, were lifted. As noted, once mother is released from the custody of the department of correction, she will be under the auspices of the department of adult probation for a period of five years thereafter. Thus. even if mother were to obtain the earliest release date possible in March of 2003, she would, nevertheless, be under the watchful eves of the Connecticut criminal justice system until 2008. At that time Kristy would be twelve and Kyle would be eight. If mother's release date was not until her maximum time was served, then she would be under the jurisdiction of the criminal justice system until April 30, 2009. At that time Kristy would have just turned thirteen and Kyle ten. Any test of mother's attainment of the requisite level of rehabilitation which was attempted while the children were returned to her care. would. in this court's view, given mother's extensive substance abuse and antisocial history, place these two children in great danger.
3. The Age and Needs of the Children
Kristy is now in excess of six and one-half years old. She was out of her mother's care, due to mother's incarceration in Massachusetts, from CT Page 696 November, 1998, to the end of January, 2000, a period of fourteen months. Even when Kristy was returned to her mother's care by the court in late January, 2000, from January through August of that year, mother provided minimum intermittent care for Kristy and her brother and left the responsible caretaking to C.S. Since mother's arrest for the armed robbery. the children have been out of her care from September. 2000. until the present time, a period of two years and four months. Kristy has been out of her mother's care for nearly one-half of her life. She has been in the home of C.M. since August, 2001. She is content and happy in that environment. She experiences no problems at home or at school. The home is spacious and sits on fifty acres of property. The child is currently in first grade and doing well. Among her extra curricular activities are cheerleading and gymnastics. She refers to C.M. and her husband as "mom' and "dad" and professes love for them and a desire to be with them forever. The foster parents are. likewise, desirous of making the relationship permanent by adopting Kristy. She is very close to her brother Kyle and her new baby brother who is the natural child of C.M. and her husband.
Kyle has been out of his mother's care, virtually his entire lifetime. As noted, when the court ordered the return of both children to mother in January, 2000. the children spent a good part of the following eight months in the care to C.S., who kept the children safe and whose willingness to provide that care lessened the impact to mothers continuing substance abuse on her children. Kyle likewise has been in the care of C.M. and her husband since his return from Virginia in August. 2001. Kyle is said to idolize his sister and is closest to her; he and Kristy have never been separated and that has been a welcome constant in his young life. Kyle is happy in the current foster home and is bonded to C.M. and her husband referring to them as "mom" and "dad." As noted, in order for mother to demonstrate that she has achieved the requisite level of rehabilitation from her substance abuse and her antisocial behavioral history, mother would have to attain that goal without the restrictions imposed by post release authorities. As also noted, once mother is released from her current confinement, she will be under the jurisdiction of the department of adult probation for five years thereafter. These two children have a right to become permanent members of a stable, loving and nurturing family. Permanency and stability for these two children must be their goal and attainment of that goal has been deferred for too long. The key question, therefore, in order to properly address the second prong under the statutory ground alleged, is whether the attainment of' the children's goal of permanency and stability should be deferred in order to permit mother the opportunity to attain her goal of total sobriety and stability in her own life. while no longer under the watchful eye of the criminal justice system. Should these children be CT Page 697 compelled by this court to continue to be placed in the foster care system, with all of its uncertainties, so that mother may be permitted more time to address issues which should have been addressed long before the commencement of this trial? Is allowing mother more time to achieve her requisite level of rehabilitation worth the risk to these two children that their current nurturing, loving and stable placement could be lost? This court is compelled to answer all these questions in the negative.
The evidence clearly established that both children have thrived in their current placement where they have been since august 2001. They have established a bond and connection with their current foster parents and are happy and content with the growing family. The foster parents have expressed a love for both children, have bonded to both children and are desirous of adopting both children. Under all of the circumstances of this case, mother's needs must be made subservient to the needs of her two children. This court, therefore, finds that the petitioner has proven by clear and convincing evidence that since the findings that Kristy was a neglected child on May 12, 1999. and that Kyle was a neglected child on September 1, 1999, mother has failed to achieve such degree of personal rehabilitation as would encourage this court to believe that within a reasonable time, given the age and needs for stability and permanency ofboth of her children, she could assume a responsible position in their lives. Subparagraph (p) of Section 17a-112 provides that:
 The provisions of this section shall be liberally construed in the best interests of any child for whom a petition under this section has been filed.
Due to mother's history of substance and abuse and incarceration as a result of her criminal conduct, mother was never in a position to provide these children with a safe and stable familial environment and, as a result, relied upon C.S. and C.M. to assume the responsibility of protecting and nurturing her children. Mother has a lot of work to do upon her release from incarceration and mother must ultimately demonstrate that she is able to achieve sobriety and be a productive member of society when not under the jurisdiction of the criminal justice system. The time required for mother to demonstrate that she could provide a permanent safe environment for her children is well into the future. Forthese two children, the future is now. There is no doubt that mother has made significant progress in recovering from and learning about her drug abuse while she awaited her sentence and while incarcerated after that sentence was imposed. These efforts, however laudable they may be, came too late for mother to present herself as an appropriate future parental source for these children. See In re Sheila J., 62 Conn. App. 470, 480-81
CT Page 698 (2001).
This case is not unlike that of In re Shane P., supra, 58 Conn. App. 234,238, which was earlier cited herein on the issue of speculation as to early release from prison. In that case the mother had been convicted, inter alia. of robbery and received a sentence of seven years in prison. Id. She had completed nearly every rehabilitative program that the prison had to offer. including substance abuse. education programs and parenting classes. Id. She apparently was a model prisoner. However, in that case the Appellate Court upheld the finding of the trial court that mother had failed to achieve the requisite level of personal rehabilitation so as to present an appropriate custodial source for her child. Id., 244. The trial court had noted that once mother was released, she would have to undergo intensive rehabilitation programs in order to appropriately address a lengthy history of substance abuse and mental health problems. Id., 239.
4. Is There on Ongoing Parent-Child Relationship Between Mother and HerTwo Children?
Pursuant to General Statutes Section 17a-112 (j) (3) (D). the petitioner alleges as a second ground for the termination of mother's parental rights to these two children that:
 [T]here is no on-going parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis, the physical, emotional. moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child.
In assessing whether the petitioner has proven this statutory ground by clear and convincing evidence. the court must undertake another two-pronged analysis.
 First, there must be a determination that no parent-child relationship exists. and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow' time for such a relationship to develop.
In re Kezia M., 33 Conn. App. 12. 20. cert. denied, 228 Conn. 915 (1993).
 It is reasonable to read the language of "no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them or has definitively lost CT Page 699 that relationship, so that despite its former existence it has now been completely displaced. In considering whether an ongoing parent-child' relationship exists, the feelings of the child are of paramount importance. The ultimate question is whether the child has no present memories or feelings for the natural parent. Feelings for the natural parent connotes feelings of a positive nature only.
(Citations omitted; internal quotation marks omitted.) In re Kezia M.,
supra, 33 Conn. App. 21.
In this court's view, mother has not met the day to day physical and emotional needs of these children since her incarceration in 1998. At that time Kristy was two and one-half years old. Other than a photograph of Kristy on a horse, there was little evidence introduced as to what if any stable environment Kristy was raised in for the first two and a half years of her life. It is clear, however. that for the past four years of Kristy's life and for Kyle's entire life. mother has failed to meet. on a day to day basis. the physical and emotional needs of these two children. As noted, mother relied heavily on C.S. to provide safety and care for her children during the months from January, 2060. up to mother's arrest in early September, 2000. Mother placed parental responsibility with C.S. and her husband so that mother would have the opportunity to get high on alcohol and crack cocaine whenever she choose to. Getting ones children out of the way and arranging for appropriate care-takers parental care so that one may pursue a course of substance abuse is the antithesis of an ongoing parent-child relationship. As to the whether or not the children have any positive feelings for mother, the evidence indicates that Kristy's feelings are mixed and that Kyle virtually has no feelings, one way or the other, relative to mother. Kyle simply follows Kristy's lead.
Witnesses who testified as to the observations of Kristy's visits with mother indicated that the visits were about horseplay and presents. Anastasio described the relationship between Kristy and her mother as "conflicted" and testified that the visitation with mother was damaging internally to Kristy. Grandelski testified that any bond between Kristy and mother was "insignificant." CM. testified, and this was confirmed by Lorin Brennan, the current caseworker, as well as both of Kristy's therapists, that Kristy never mentions her mother. C.M. also testified that the visits were disruptive and hard on Kristy to the point where Kristy once asked C.M. not to tell her until the last minute of an impending visit with her mother. Murphy noted in her report that mother behaved appropriately during the visits and that mother maintained regular contact with Kristy and Kyle whether in or out of prison. As a result, Murphy reported that there was an ongoing relationship. however, CT Page 700 the relationship, as to Kristy, was confusing and conflicted. Unless the child received presents there was no affection toward mother by Kristy. When mother exclaimed "I love you" there was no response from the child and when the child departed mother's presence. no hugs and kisses. just the pat on the head. Visits were about fun and games and presents and . . . sadness for Kristy. Witnesses report that mother spent most of her time and effort during the visits with Kristy and had little interaction with her son. This court, therefore, finds that there is no ongoing parent-child relationship in the sense that the mother has met on a day to day basis the physical. emotional. moral and educational needs of both of her children. As to the first prong, this court finds, by clear and convincing evidence, that the petitioner has met its burden.
In order to satisfy the second prong under the statute, the court must determine whether the allowance of additional time to establish a positive parent/child relationship would be in any way detrimental to the children's best interest.
 The factors to be considered in deciding whether it would be in [child's] best interest to permit further time for a relationship with a [parent] to develop include (1) the length of stay with her foster parent's (2) the nature of her relationship to her foster parent's, (3) the degree of contact maintained with the natural parent. and (4) the nature of her relationship with her natural parent.
In re Kezia M., supra, 33 Conn. App. 22.
In addressing the issue as to whether it would be detrimental to the best interest of Kristy and Kyle to allow further time for a positive parental relationship to develop between mother and her two children. the court has considered the testimony of the children's therapist. Dr. Murphy and mother herself. The court has already noted the positive familial connection that Kristy and Kyle have made with C.M., her husband and the new baby. The court has already noted the strong parental feelings that both children have exhibited and have expressed toward CM. Both children have now been with their current foster parent's for in excess of sixteen months.
Anastasio testified that Kristy "idolizes C.M." yet mother has consistently attempted to destabilize the bond that Kristy has made with C.M. by instructing the child to refer to her as her aunt rather than her mother. Anastasio testified that, based upon her observations, both children seek guidance and approval from C.M. Grandelski testified that Kristy has expressed. in words her hope that she will be adopted by C.M., and her husband and that she and her brother will become permanent CT Page 701 members of that Family. Murphy confirmed that Kristy refers to C.M. as her mother and to C.M.'s husband as her father. Murphy was concerned as to the conflicted loyalties that Kristy exhibited when Murphy observed the interaction between Kristy and her mother. Mother herself testified that both children "love" C.M.
The court has carefully considered the four factors referred to above in accessing the second prong under the statute and finds that whatever parental relationship existed between these two children and their mother has clearly been displaced by the parental bond they have formed with C.M. and her husband. Allowing mother further time to attempt to regain the type of ongoing parent-child relationship that is referred to in the statute and the quoted cases would only' serve to undermine the positive bond the children have forged with their current foster parent's and would be detrimental to their best interest.
This court therefore finds that the petitioner has met its burden of proof relative to the second prong under the cited statute. This court finds that the petitioner has proven by clear and convincing evidence that no ongoing parent-child relationship, within the meaning of the cited statute and the cited cases. exists between these two children and mother, further, to allow additional time for the establishment or re-establishment of a positive parent-child relationship would not be in the best interest of either child.
V. DISPOSITION
Now that the court has found in the adjudication stage that the petitioner has proven each of the statutory grounds alleged by clear and convincing evidence. this court must consider whether termination of the parental rights of the respondents is in the best interest of their children. The burden remains with the petitioner who must convince the court that termination is. in Fact. in Kristy's and Kyle's best interest. In making its determination as to best interest, the trial court may take into account not only events preceding the filing of the present petition, but-may consider all events up to the conclusion of the trial. Practice Book § 33-5 [now § 35a-9]. Each case must be decided on its particular facts and circumstances as it has been held that the determination of whether to terminate parental rights is a highly fact-specific process. See In re Shane P., supra. 58 Conn. App. 254.
"The desire and right of a parent to maintain a familial relationship with a child cannot be separated from the desire and best interest of a child either to maintain or to abandon that relationship, or the interest of the state in safeguarding the welfare of children. These legitimate CT Page 702 interests of parent, child and state require a balancing of the factors involved in those interests." In re Shaquanna M., 61 Conn. App. 592,598-99 (2001). "In every case involving parental rights, a struggle exists between parents and the state to determine what is in the child's best interest. the child being the focus of the struggle." (Internal quotation marks omitted.) In re Dorrell R., 64 Conn. App. 455. 467 (2001).
"The trial court is vested with broad discretion in determining what is in the child's best interests." Schult v. Schult, 241 Conn. 767, 777-78,699 A.2d 134 (1997). "Conducting a best interest analysis is not a narrow concept restricted to a compelling reason [keeping a parent in a child's life] or to Fully reuniting the parent with the child. Rather, it is purposely broad to enable the trial court to exercise its discretion based upon a host of considerations." In re Allissa N., 56 Conn. "App. 203, 208 (1999) cert. denied, 252 Conn. 932 (2000).
"The primary concern of [the department] is the safety of [the child]. . . . Where appropriate the agency can and must take unilateral action either to reunite Families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings." (Internal quotation marks omitted.)In re Shane P., supra, 58 Conn. App. 258.
General Statutes § 45a-727a delineates the state policy concerning the best interest of the child:
 (1) The best interests of a child are promoted by having persons in the child's life who manifest a deep concern for the child's growth and development; (2) The best interests of a child are promoted when a child has as many persons loving and caring for the child as possible; (3) The best interests of a child are promoted when the child is part of a loving. supportive, and stable family whether that family is a nuclear, extended, split, blended, single parent, adoptive or foster family. . . .
In the case of In re Shyina B., 58 Conn. App. 159, 167 (2000). The court states: "The best interests of the child includes the child's interest in sustained growth. development. well-being, and continuity and stability of its environment."
A. As to the Children
Of necessity, the court has already referred to the children's current placement in its analysis of the second prong of both the failure to CT Page 703 rehabilitate and the parental relationship statutory grounds. Mother lost the ability to care for Kristy in November. 1998. when she was convicted for the tenth time of operating a motor vehicle while under the influence of liquor and sentenced for a period of two years. Father had demonstrated his inability to provide appropriate care for Kristy by continuing to abuse illegal substances, allegedly selling illegal substances. providing inappropriate caretakers For Kristy and involving his young child in other dangerous behaviors. Shortly after Kyle was born, on May 3, 1999, he was placed with C.S. with whom Kristy had been placed one month earlier. When the children were returned to mother's care by the court, mother continued to abuse substances and relied upon the dedication of C.S. to the comfort and safety of these children to provide said children with an appropriate environment. Mother used C.S. and her family, however fortunately for these two children, C.S. and her family desired to be used in that fashion, a desire born out of love, affection and care for Kristy and Kyle. Despite the concerns of C.S., C.M. and the children's therapist, an experiment was attempted in May of 2001, when the children were sent to Virginia to reside with their maternal aunt and uncle, a placement which failed miserably'. Fortunately for Kristy and Kyle. C.M., who had forged a continuing, loving, caring relationship with these two children took the children into her home where they have remained and thrived ever since. Both children are now happy and content in a stable, caring and loving familial relationship. Both children look to C.M. and her husband for their care, instruction, guidance and approval. Both children expressed love for their foster parents and a desire to remain permanently a part of that family.
Kristy is now in the first grade and has done well in school. She engages in many extracurricular activities and has many friends, some of whom sleep over at the foster home. According to Grandelski. Kristy has formed a parental bond with C.M. and her husband and expresses love and concern not only for her natural brother but for her new' baby brother, Kristy's emotional state has been "normalized" due, according to the child's therapist, to the care and nurturing provided by C.M. Anastasio testified that Kristy "idolized C.M", and "brightened up" whenever the therapist spoke her name. Both therapists urge this court to terminate mother's and Father's parental rights so that the adoption of these children by C.M. and her husband could take place without further delay and without further disruption to the lives of these young children. C.S. continues to play a significant part on a daily basis in the lives of these children: the children refer to C.S., as "granny." Mother expressed deep gratitude to C.M. and C.S. for the safe, loving and nurturing care they have provided for these children, care which in Kyle's case has been virtually his entire life, and care which in Kristys case has been for half of her life. Mother admits that the children have CT Page 704 received "good care" at the home of C.S. and pledged to continue the children's relationship with the current foster family once the children were returned to mother's care. Perish the thought as to what type of existence these two children would have experienced if it had not been for the love and dedication of C.M. and C.S. As the Appellate Court stated, in quoting Judge Quinn's opinion in the trial court: "There are circumstances where parents, through various acts, have lost their connection to their children and new connections are in the process of being established by their children with others. For these children, permanency is necessary and a continued, even limited connection to their biological parents can and does disrupt such permanency." In re AlissaN., supra 56 Conn. App. 210.
 B. As to Father
Father has never been an appropriate custodial source for his children. In late 1998 and early 1999. when father had the sole custodial responsibility for Kristy, father engaged in selling illegal substances: father engaged in operating his motor vehicle at high speeds with the child in the car without a car seat: father relied on very inappropriate caretakers while he continued to abuse cocaine. As noted. the couple met while they were both engaged in substance abuse treatment mandated by Massachusetts correctional authorities at the Longwood Treatment Center. Despite the loss of his two children to Foster care, despite the disastrous affects that his substance abuse had inflicted on all aspects of this life and despite witnessing the effects of substance abuse on his wife. father did not engage in any meaningful treatment for his substance abuse until the summer of 2001. which was in excess of two years from the time that Kristy was removed from his care. Kyle has never been in father's care. After mother received the sentence which she is currently serving, father disengaged from any therapeutic treatment and substance abuse relapse prevention treatment. As noted, on March 5 2002, father voluntarily gave his consent to the termination of his parental rights, subject to this court finding that it was in the children's best interest that he do so. This court finds, by clear and convincing evidence, that termination of father's parental rights is in the best interest of Kristy and Kyle.
 C. As to Mother
With the exception of the period of late January, 2000, through July, 2000 (when the two children were legally in mother's custody, but protected and cared for by C.S. several days each week). mother has been incarcerated or under the threat of incarceration from November, 1998, to the time of the termination trial — a period of four years. Mother CT Page 705 will be under the jurisdiction of the department of correction or the department of adult probation, at the very least, until 2008. Mother will not have the opportunity, therefore, to demonstrate the attainment of sobriety and the cessation of her antisocial behaviors, without the threat of incarceration looming over her head, until Kristy is twelve and Kyle is nine. At that time the two children would have been continuously out of mothers custodial care for ten years! As noted, the return of the two children to mother's care "Drior to mother's ability to demonstrate that she could maintain a sober and stable life when not under authoritarian scrutiny, would constitute a dancer to Kristy and to Kyle. as mother has been unable to maintain sobriety and stability without such scrutiny since 1998.[6] Mother has suffered the removal of all three of her children from her life due to her alcohol and cocaine abuse and, up to her arrest for armed robbery, continued to abuse those substances despite said removals, despite six incarcerations in Massachusetts, and despite several court mandated inpatient treatment programs.
The children have been continuously out of mother's care since August, 2000, and have been in the continuous care of C.M. since August, 2001. Kristy's therapists agreed with the action taken by the petitioner in seeking to terminate the respondents' parental rights. They agree that both children are happy and content with C.M. and have been well cared for by G.M. Both agree that C.M. and her husband are viewed by the children as their mother and father. Both agree that it is in the best interest of these children to make permanent, through adoption, the bond that has developed between the children and C.M.
As testified to by said therapist and the department visitation supervisor. Kristy's relationship with her mother is conflicted and is about presents and sympathy, while Kyle simply follows whatever his sister does. As this court has previously found herein, there is no ongoing parent-child relationship. as the same is defined by statute and described by the courts, between mother and the two children.
Murphy after examining many documents relating to this family's history. including documents submitted, ex parte, by mother, concluded that reunification with mother was not in the best interest of these children due to mother's substance abuse and antisocial history, her demonstrated inability to seek out and be committed to treatment "on her own. " and her inability to handle stressful situations without resort to substances. Murphy was also concerned that Kristy. due to mother's past neglect had become "parentified" In her report Murphy stated:
 The caretaking and focusing on satisfying others needs Kristy displayed was beyond what is developmentally expected for a child of her age, is CT Page 706 consistent with a history of neglect and being placed in a position of having to take care of her own needs and possibly Kyle's because of her parents' limitations. Returning the children to a home environment in which Kristy is placed in a care-taker roll will deprive her of her childhood and endanger the safety of the children.
In termination proceedings. the psychological opinions of professionals is entitled to great weight. In re Eden F., 250 Conn. 674. 706-707 (1999).
Murphy, Grandowski and Anastasio all agreed that a bond existed between mother and Kristy. however, all agreed also that the relationship was a source of conflict within this child. Grandelski stated that the bond was "insignificant." Anastasio stated her opinion that retaining the bond was "not healthy" for Kristy. All three witnesses stressed the need of both of these children. given the history of disruptive placement with family members, for permanency and stability. Given the constructive placements with C.S. and C.M., stability has been and is being provided. Permanency is long over due.
The evidence has clearly shown that mother's ability to maintain sobriety when not in a controlled environment is tenuous. The evidence has clearly shown that Kristy and Kyle have suffered serious neglect when in mother's care. The evidence has clearly shown that these two children are fearful of removal from C. M's home and have formed a positive parental bond with C.M. and her husband. Due to mother's demonstrated inability to provide appropriate parental care, the significant risk that she will continue to abuse alcohol and drugs when not under external controls and the strong emotional ties of these two children to C.M. and her family, this court finds that the petitioner has proven, by clear and convincing evidence, that termination of mother's parental rights is in the best interest of Kristy and of Kyle. Cf. In re Kasheema L.,56 Conn. App. 484, 490-91 cert denied, 252 Conn. 945 (2000).
VI. THE STATUTORY FACTORS
In a nonconsensual termination, the court, in deciding whether termination of a parent's rights is in a child's best interest, is mandated to consider those factors provided in § 17a-112 (k) which serve as guidelines to assist the court. Proof of each factor by clear and convincing evidence is not required. In re Quanitra M.,60 Conn. App. 96, 104, cert. denied, 255 Conn. 903 (2000). The court, therefore, in deciding to terminate mother's parental rights, has considered the following: CT Page 707
1. The Timeliness, Nature and Extent of Services Offered
Appropriate and timely services were provided to mother by the department including professional evaluations; visitation services; substance abuse evaluations, testing and treatment: therapeutic services and case management. As noted. visitation was provided between the children and mother when mother was in prison and when mother was out of prison. During the eight month period when mother was under the auspices of AIC and the criminal court prior to her sentence, the department. in cooperation with the criminal authorities, arranged for substance abuse testing and treatment. Also as previously noted, during the time of the children's initial commitment, the department worked with the family and their efforts resulted in the return of the children to mother and father in January of 2000. As to the children, the department has provided appropriate licensed Foster care, two separate therapists for Kristy and transportation for visitation purposes.
2. Reasonable Efforts to Reunite
Such efforts are mandated by the Federal Adoption Assistance and Child Welfare Act and the Adoption and Safe Families Act of 1997,42 U.S.C. § 670 et seq., and Connecticut's termination statute. § 17a-112 (j) (1). This court has earlier herein found that such efforts were made by the department consistent with the statutor's mandates.
3. Fulfillment of Court-Ordered Obligations
During the two separate neglect proceedings involving the department and the respondents. on three separate occasions, the court issued to mother the specific steps required by what is now' General Statutes § 46b-129 (j). The first of the series of court-ordered steps was issued on April 7, 1999. (Petitioner's Exhibit 1). At the time, mother was serving her sentence in Massachusetts and Kristy was in the sole care of her father. Mother was ordered to learn how to implement appropriate methods of providing Kristy with a safe and nurturing home environment. Mother was ordered to gain insight and understanding regarding the negative effect of her substance abuse on said child. Mother was ordered to refrain from any abuse of substances and from any further involvement with the criminal justice system. As noted, when Kristy and Kyle were returned to mother in January 2000. instead of learning how' to appropriately provide care for her children, the safe and nurturing home environment was provided by C.S. Instead of gaining insight as to the negative effect of her substance abuse on her children, mother continued to abuse substances and took advantage of C.S.'s concern for the welfare CT Page 708 of these children by placing the children with C.S. so that she could continue her substance abuse. As to no further involvement with the criminal justice system, certainly that court-order was ignored on September 3, 2000, when mother robbed the variety store. Court-ordered steps were issued on September 12, 2000, at the time of the issuance of the second order of temporary custody. Those preliminary steps were made permanent on April 4, 2001, when both children were committed to the care and custody of the department For a second time. (Petitioner's Exhibit 4.) There is no doubt that mother has accessed, while out on pre-sentence release and during her post sentence confinement, appropriate services to deal with her substance abuse. Mother has also taken parenting classes. There was no evidence. however. that mother has in any way dealt with her mental health issues or that appropriate services to deal with those issues are available through the department of correction. As previously noted. Dr. Murphy' stresses mother's need for a long-term mental health therapy. Analysis of mother's early lack of compliance and later compliance with the court-ordered specific steps underscores the concerns raised by witnesses at the trial, and expressed herein by this court, as to mother's ability to stay connected with substance abuse relapse prevention therapy and mental health services, while she is no longer under the supervision of correction or probation authorities. For this court to compel Kristy and Kyle to wait for those circumstances to occur would be most detrimental to the best interests of said children.
4. The Feelings and Emotional Ties Between Mother and the Children andthe Foster Parents and the Children
As to Kristy, this court has already detailed the conflicted relationship between her and her mother and the negative and insignificant bond that does exist. This court also has already detailed the positive parental bond which Kristy has forged with C.M. and her husband. The negative aspects of Kristy's life need to be eliminated and the positive aspects need to be fostered. Termination of the parental rights of the respondents will accomplish that goal and is clearly in Kristy's best interest.
As to Kyle, this court has stated herein that he idolizes his older sister and follows her lead in whatever she does. Kyle is happy and content in residing in the home of C.M. and her family. Kyle has also forged a parental bond with C.M. and her family, Kyle, in the Opinion of this court. has an insignificant bond with mother as mother provided little or no care for her son during his young life. It is indeed in Kyle's best interest that the parental rights of the respondents be terminated. CT Page 709
5. The Ages of the Children
Kristy is now in excess of six and a half years old and has been continuously out of her mother's custodial care since August, 2000. Kyle is now in excess of three and a half years old and has been out of his mother's care for, virtually, all of his life. For these children, the implementation of the permanency plan of termination and adoption by C.M. and her husband is long overdue. Any impediments to attaining the same must be removed. Termination of the parental rights of both the children's biological parents is a desirable and necessary step in that direction.
6. Mother's Efforts to Adjust Her Circumstances, Conduct and Conditions
In January 2000, mother, despite ten separate convictions for operating under the influence and despite having one child permanently removed from her care and having two children committed to the department, was given a golden opportunity to provide appropriate, safe, and permanent care for Kristy and Kyle. All mother needed to do was to remain sober, access appropriate relapse prevention services, comply with the law and the standards of societal conduct. and love and nurture these two children. Instead of following the path necessary to retain the guardianship and custody of these two children, mother relied on C.S. to provide care and safety' for her children while mother continued to abuse alcohol and cocaine, the cocaine abuse apparently affecting mother to such an extent that she was compelled to engage in an armed robbery. The evidence clearly shows that mother has been unable to control her substance abusine and antisocial behaviors when not under threat of incarceration or actually incarcerated. The only attempts, thereFore. that mother has made to adjust her circumstances and conduct to the extent necessary to present an appropriate parental source For her children. have been made, as recently demonstrated, while she was incarcerated. Those efforts have come much too late for these two children, whose best interests demand that they have permanency now.
7. The Extent to which a Parent has been prevented from maintaining ameaningful Relationship With the Child by the unreasonable Act or Conductof the other Parent of the Child, or the unreasonable Act of any otherperson or by the economic Circumstances of the Parent
Neither the unreasonable act or conduct of father nor the unreasonable act of any other person nor economic circumstances has prevented mother from maintaining a meaningful relationship with these two children. Mother and father have no one to blame but themselves for the permanent removal of Kristy and Kyle from their lives. CT Page 710
Mother has clearly demonstrated her ability to obtain lucrative employment while not abusing substances. There was no indication during the trial that mother was ever prevented by economic circumstances from building a lasting. loving and caring relationship with her children.
VII. CONCLUSION
This court finds, by clear and convincing evidence, that termination of the parental rights of both parents is in the best interest of both children. They have been with C.M. for one year and four months and were cared for by her mother, C.S., for many months before that. They not only have a parental bond with C.M. and her husband, and refer to them as "mom" and "dad," but C.S. continues to be a daily' part of their lives. They refer to C.S. as "granny." Both Kristy and Kyle are entitled to have this loving and caring relationship made permanent.
Kristy, then Kyle, were removed from their Father's care in April, 1999, nearly four years ago. In November, 1998, over four years ago, mother was removed from their lives as a result of her tenth drunk driving conviction. Mother and Father then continued their life style, which is characterized by domestic violence, substance abuse and antisocial conduct. It was not until mother faced long-term incarceration for a major felony that either began to address their twenty year history of aberrant behaviors. By then a strong relationship had formed with C.S. and C.M., a relationship that was promoted and approved by mother and father. It is in the best interest of both children to make that relationship permanent.
VIII. ORDERS
Based on the foregoing, it is.
ORDERED that the parental rights of Thomas A., his consent having been accepted on March 5, 2002, by this court, and of Dawn A., because of her failure to achieve that degree of rehabilitation and because of a lack of an ongoing parent-child relationship, all within the meaning of §17a-112 (j), be and are hereby terminated with respect to their minor children Kristy A. and Kyle A.
ORDERED that the commissioner of the department of children and families is hereby appointed statutory parent for both of said children who shall submit to the Superior Court for Juvenile Matters at Willimantic, within thirty days of this judgment, a case plan, and thereafter, such further reports as may be required by law until adoption by C.M. and her husband CT Page 711 is finalized.
 ___________________ WILSON J. TROMBLEY, JUDGE CHILD PROTECTION SESSION